SHANA VILLAREAL,

    Plaintiff,

v.

THE BUCKLE, INC.,

    Defendant.

Case No. 15-14382
Honorable Laurie J. Michelson
Magistrate Judge Patricia T. Morris

---

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [20] AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [24]

---

The parties agree that in 2015, Plaintiff Shana Villareal was shopping at a Buckle clothing store with her five children, the store's security alarm sounded around the time Villareal was leaving the store, Buckle staff searched Villareal and her children, no merchandise was found, Villareal left the store, and she returned a few minutes later to get The Buckle's corporate number. Beyond that, their versions of what happened diverge.

Defendant The Buckle Inc. seeks summary judgment relying on its evidence that Villareal set off the alarm when she crossed the sensor gate at the store's exit and that the manner in which Buckle staff searched Villareal was reasonable. But this overlooks that, on summary judgment, the facts must be taken in the light most favorable to the non-moving party, Villareal. And Villareal has testified that the store's alarm sounded before she ever crossed the sensor gate and that the search was conducted in an unreasonable fashion.

Villareal also seeks summary judgment and, to a lesser extent, also fails to fully embrace her opposition's account of what happened. Villareal says that every reasonable jury would find that the store manager defamed her because, by the time she came back to the store, she had

already been searched, Buckle staff had found no merchandise, and she did not trigger the alarm. But Villareal does not give adequate consideration to The Buckle's evidence that, when Villareal was in the fitting room, Buckle staff heard sensors being removed, that the search for stolen merchandise was not exhaustive, and that, at least by the time Villareal returned to the store, Buckle staff had found broken sensors in the fitting room.

Taking the facts in the light most favorable to the party opposing summary judgment, the Court finds that Villareal is not entitled to summary judgment and The Buckle is entitled to summary judgment on only one of Villareal's three claims.

## I.

## A.

In the late afternoon of November 29, 2015, Villareal and her five young children took a trip to the mall. (R. 24, PID 410, 423.) They started with  a family portrait at JCPenny's. (R. 24, PID 413; R. 20, PID 176.) Then they went shopping at a Buckle store. (R. 24, PID 412.)

According to the company's website, The Buckle "is a leading retailer of medium to better-priced casual apparel, footwear, and accessories for fashion-conscious young men and women." As it was the holiday season, and her husband was not with her, Villareal wanted to get her husband a Christmas present. (R. 24, PID 412.) Villareal soon found him a pair of pants, a shirt, and some cologne. (R. 24, PID 414.)

Villareal then decided to look for some jeans for herself (over the prior few years, she had bought 14 pairs from the Buckle). (R. 24, PID 412, 414.) Villareal found three "Rock Revival" jeans that she wanted to try on. (R. 24, PID 414.) After a Buckle sales associate hung the jeans in a fitting room, Villareal went in. Along with her came her three-year-old daughter in a stroller, her nine-year-old daughter, NNB, and her five-year-old daughter. (R. 24, PID 415.)

Villareal's two other children, her eight-year-old son and twelve-year-old daughter, stayed in the store. (R. 24, PID 415.) NNB was holding the pants, shirt, and cologne for Villareal's husband as they went into the fitting room. (R. 24, PID 415.) Villareal would later testify, "I went to go and give it to the sales associate and [NNB] wouldn't let it go, and I'm like she's autistic, I promise you she'll bring it back out, can she just hold onto it[?]" (R. 24, PID 415.) While Villareal was trying on the three pairs of jeans, her twelve-year-old daughter brought her two shirts to try on. (R. 24, PID 415.) Villareal sent one shirt back, took the other to try on, and gave her twelve-year-old one of the jeans. (R. 24, PID 415.) Villareal recalls that the clothes did not work for her and that she gave them back to the sales associate. (R. 24, PID 416.)

Villareal then decided to try on a different brand of jean, "Miss Me," that a sales associate had suggested earlier. (R. 24, PID 417.) The associate assisting Villareal picked out two, and Villareal returned to the fitting room. (R. 24, PID 417.) After trying on one pair of the Miss Me jeans, Villareal's son, who has a medical condition that requires him to use the bathroom immediately, came to the fitting-room door and stated, "mommy, gotta go right now." (R. 24, PID 427.) So Villareal put her pants back on without trying on the second pair of Miss Me jeans. (*Id.*)

Villareal recalls that after exiting the fitting room she gave all the clothing, including the items that NNB had been holding, to a Buckle sales associate: "I knew her name at the time because I called her Miss Whatever, because that's the only way that [NNB] will let someone near her is if she has the name. So I ended up giving her all the stuff, I said look, I will be right back to purchase this. I need to take my son to the bathroom." (R. 24, PID 418, 427.)

Over the course of Villareal's visit to the Buckle, Buckle employees had become suspicious of her conduct. According to Cassandra Evanish, an assistant manager working that

day, "[another staff member] let me know that she [had] heard sensors being popped off inside of the fitting room, as well as she [had] seen the children that were with the young lady in the fitting room running around and had found sensors where they had been running, like defeated, broken sensors where they had been running around." (R. 24, PID 449.) Evanish further recalled, "They had already tried using recovery statements, and then the individual in the fitting room was acting even more suspicious, and the children were running around, putting the clothes back and grabbing more clothes and then continuing the cycle." (R. 24, PID 449.)

According to Evanish, "recovery statements" are attempts to recover merchandise from a customer through veiled questioning. As an example, an associate might say this to recover a shirt: "Hey, I found a pair of jeans that would really go with that shirt that you were trying on. Would you help me find [that shirt] really quick so we can see if they match at all?" (R. 24, PID 445–46.) As for the "sensors" Evanish referenced, they are familiar to most shoppers: devices attached to clothes that set off a store's alarm when they cross a sensor gate located at the store's exit. (*See* R. 24, PID 415–16.)

At her deposition, Villareal testified that she had no device that could remove the sensors. (R. 24, PID 416.) In the context of discussing her first trip to the fitting room, Villareal testified that she did not dismantle any sensors. (R. 24, PID 415.) She also stated that she did not remove any sensors from the Miss Me jeans (and neither did her kids) and that she never saw broken sensors on the floor of the fitting room that she used. (R. 24, PID 428, 432, 437.) When asked whether the pants she had picked out for her husband had sensors, Villareal testified: "I don't know. I didn't even unfold the pair of pants for my husband." (R. 24, PID 416.)

Even if Villareal or her children did not remove any sensors, Buckle staff apparently thought she had: they called mall security "to let them know that we were going to be doing a

stop." (R. 24, PID 449; *see also* R. 24, PID 452.) Mall security dispatched Amanda Eickholt. (R. 24, PID 467.) Eickholt testified that when she arrived at the Buckle store, "I met with one of the employees . . . . They informed me that the kids were handing [a female in the fitting room] merchandise underneath the door, which is not Buckle's policy. . . . The employee that I spoke with told me that they could hear sensors hitting the floor like they were being cut, so I just stayed in the store until she came out of the fitting room and then exited." (R. 24, PID 469.)

According to surveillance video from the store, Eickholt was not the only security present. The video shows a uniformed mall security officer, a uniformed Flint police officer (or perhaps another mall security officer), and Eickholt, in plain-clothes, all inside the store as Villareal was about to leave. (Video at 19:38:42; *see also* R. 24, PID 449, 475.) Evanish recalled one mall security guard inside the store and two right outside in the mall. (R. 24, PID 449.) "They were already in place just in case we needed them." (R. 24, PID 449.) Evanish positioned herself at the front of the store. (*See* R. 24, PID 449, 455.)

What happened next depends on who you ask.

Both Evanish and Eickholt testified that Villareal passed through the sensor gate at the front of the store and the store's alarm went off. (R. 24, PID 451–52, 469, 482.) In particular, Evanish testified as follows: "Q. You watched [Villareal] exit through the entrance of The Buckle? A. Yes . . . . Q. . . [I]f you recall, when Ms. Villareal was leaving, was anybody else leaving at the same time? A. No." (R. 24, PID 449, 451.) And when asked, "Do you know or do you recall if there was another individual either from Security or an employee standing by the alarm and maybe moving merchandise that accidentally set it off at the same time she was walking out?," Evanish responded, "No, there was not." (R. 24, PID 451.) Eickholt recalled things similarly: "Q. Do you know if anybody else was exiting at the same time [Villareal]

was? . . . . A. There was not. . . . Q. And you definitely watched her walk out of The Buckle and the door alarm went off? A. Yes." (R. 24, PID 469, 482.) (Based on the surveillance video, it is not clear how Eickholt saw Villareal exit: the video shows Eickholt at the back of the store at the time. (*See* Video at 19:39.)) Eickholt also testified that aside from a sensor crossing the gate, she had never seen another way to trigger the door alarm. (R. 24, PID 482.)

Villareal described the circumstances of the alarm sounding very differently. She testified that the alarm went off when she was still "[f]ive" or "ten feet" away from the sensor gate: "I was nowhere near the door. And I've been to that store prior, you actually have to be going through that sensor because I've walked past the sensors like in the front when I've been shopping there since that incident and I didn't even set it off." (R. 24, PID 420.) Indeed, Villareal said she was searched by Buckle staff before she ever walked through the sensor gate. (R. 24, PID 420.) She conceded, however, that some of her children were "three, four feet in front of [her]." (R. 24, PID 423.) When asked why she thought the alarm had sounded, she explained that staff near the store's entrance may have set it off. (R. 24, PID 430.) Villareal thought Buckle employees may have been "target[ing]" her: "I've got five small children, I'm young, I was by myself, you know, I'm white, [my children are] Mexican, you know. . . . And white employees were at the store. There was no dark colors at any means." (R. 24, PID 430.)

The parties' accounts of what happened after the alarm sounded also diverge.

Evanish recalled that Villareal turned around to come back in the store and triggered the alarm a second time. (R. 24, PID 452, 460.) And, said Evanish: "[a]s soon as the alarm went off, [Villareal] shoved the stroller away from her, threw off her jacket and said, 'I'm not stealing nothing. I didn't steal anything.'" (R. 24, PID 450.) Evanish further recalled:

> I said, 'Well, hang on. You know, nobody is saying that you did. I guess there's something that's setting off our alarm, so if you don't mind, you know, if you can

take your jacket off, let me see; maybe lift the jacket down below the shoulder for me, just if you don't mind moving stuff around so I can see,' and at that point her children were with her, and I said, 'You know, if you don't mind, maybe ask the kids to open up their jackets for me, if you would, you know, If you can do that,' and she continued to be, 'I didn't steal anything,' very defensive.

(R. 24, PID 450.) Evanish testified that she did not "personally touch [Villareal's] belongings or go through anything" and instead asked Villareal to open her purse and asked Villareal to have her children open up their jackets. (R. 24, PID 454–55.) Evanish testified (and all agree) that no Buckle merchandise was found. (R. 24, PID 458.)

Villareal recalled things very differently. According to her, as soon as the alarm sounded, she was "swarm[ed]": "[mall security] come running and stood right in front of the door and then two more employees blocked the door and two over here to the . . . right blocked the door and then I had another one behind me and my children and then I had two more by the sales table." (R. 24, PID 428, 433.) Buckle staff did not ask Villareal to walk through the sensor gate to see if the alarm would sound again. (R. 24, PID 434.) Instead, staff asked if she had any unpaid items and, once she said no, they began searching. (R. 24, PID 424–25.) Villareal recalled,

They grabbed my purse, opened up my purse, grabbed that. They very loudly in front of the door asked—they said do I have anything on me and I said no I've got skin tight jeans on. Well, what's underneath your shirt? I'm like nothing. Well, you need to lift that up so we can see. I lifted it up. I had a tank top on. Is that our tank top? No, it's by a different company. And they need—they had checked that and clearly it was by a different company. They grabbed my coat and they kept saying we know you have something, you have something on you.

(R. 24, PID 431.) Villareal also testified that Buckle staff "moved the hood [of] my stroller up as well to check that, they removed my child's blanket." (R. 24, PID 419.) Further, staff searched "every single one" of her children's coats. (R. 24, PID 419.) Villareal recalled, "They made my son lift up his stuff, his shirt and whatnot, and he ended up peeing his pants right in their store." (R. 24, PID 419.) She also remembered Buckle staff "patt[ing] him down like a police officer

would do." (R. 24, PID 428.) And, said Villareal, "my [daughter], who was already in one of her autistic modes, they ended up trying to grab her and take her coat from her, se[n]t her into a crying rage." (R. 24, PID 419.) In particular, Villareal recalled a lady in a "flower[]" shirt grabbing NNB's "left arm to get her to stand up." (R. 24, PID 422; *see also* R. 24, PID 419.) The lady in the flower shirt was the manager of that Buckle store, Kristen Aldrich. (*See* R. 24, PID 419, 448, 451–52.) Villareal testified that she and her children were asked to walk through the sensor gate and none of them set off the store alarm. (R. 24, PID 431.)

Eickholt (the plain-clothes, mall-security officer) recalled the search as being rather mundane: "The Buckle employees approached [Villareal], asked her to come back into the store, which she did so willingly. There was no incident. They checked the bottom of her stroller to see if there was merchandise in there. They spoke with her and then she left the store. No merchandise was located at that time." (R. 24, PID 470.) She recalled, "There was no kind of disagreement or anybody being irritated with anybody." (R. 24, PID 477.) Eickholt remembered Buckle staff "physically pulling the coats out of the undercarriage of the stroller" (R. 24, PID 479), but could not remember if anyone checked Villareal's purse or diaper bag (R. 24, PID 479).

After the search was complete, Villareal asked if she could take her son to the bathroom. (R. 24, PID 419.) She recalled, "[T]hey said well, you set our sensors off and I said how is that possible when you just searched everything including my children's articles and they said well, we know you have something, you set our sensors off." (*Id.*) From Villareal's perspective, "They were kind of rude about it, they said whatever, leave, we just know you have something." (R. 24, PID 432.) When Villareal left the store, the alarm did not sound again. (R. 24, PID 452, 460.)

According to Eickholt, the whole incident was "[l]ess than five minutes." (R. 24, PID 470.) Eickholt's testimony is backed by the video. It shows Villareal speaking with Aldrich (identifiable by her flower shirt) before heading to the front of the store, Aldrich then going to the front of the store and out of view, and then Aldrich returning to the picture about four minutes later when, apparently, the incident was over. (Video at 19:38:48 to 19:42:48.)

After leaving the Buckle, Villareal called her husband. Her husband recommended that she "go back in and grab a card." (R. 24, PID 419.)

So about three or four minutes after leaving, Villareal returned to the Buckle. (*See* Video at 19:45:47.) She went to the register area and spoke with Aldrich. (*See* Video at 19:45:47 to 19:47:13.) Villareal testified, "[Aldrich] made an accusation when I c[a]me back to grab the number for corporate saying that I had something to cut this stuff off because they found [sensors] in [the dressing room]. And I said how is that possible? She goes you probably disposed of it." (R. 24, PID 434.) Villareal also recalled, "[Aldrich] grabbed a book off the counter, wrote down a number on the card and told me never to come back and I said I didn't take anything, you guys have proven that I didn't take anything and they said well, we know you did. You disposed of it prior to coming back." (R. 24, PID 432.) The video shows that when Aldrich was speaking with Villareal, there were other Buckle employees nearby. (*See* Video at 19:45:47 to 19:47:13.)

After leaving the Buckle for the second time, Villareal went back to JCPenny's. Eickholt testified that mall security radioed (or called) JCPenny's and asked JCPenny's to notify them if Villareal attempted to go back into the mall. (R. 24, PID 472.) Demond Johnson had video-surveillance duties for JCPenny's that day. (*See* R. 25, PID 560–61.) He testified, "I told [mall security] that she was fiddling around underneath the stroller. . . . And I'm pretty sure that

fiddling around was getting her kids' coats and stuff out to put on and maybe to head on outside." (R. 25, PID 562.) Johnson also testified that JCPenny's does not have sensor gates at its doors. (R. 25, PID 559.) Eickholt said the same. (R. 24, PID 481.) Despite Johnson and Eickholt's testimony, a report completed by the Buckle about the incident provides the following: "About 25 minutes after the last time [Villareal] was in the Buckle she set off the alarm at JCPenney's and a pair of our jeans had fallen out of the coat of one of her kids—who was 5 or 6 years old. JCPenney's didn't pursue anything because it wasn't [their] product—so she was able to leave with our jeans." (R. 25, PID 555.)

### B.

Villareal, believing she had been wrongly searched for and accused of shoplifting, has sued The Buckle, Inc. Her amended complaint asserts that The Buckle is liable for false imprisonment, defamation, and intentional infliction of emotional distress.

The parties have each filed a motion for summary judgment. The Buckle says that no reasonable jury could find it committed the three torts asserted in the amended complaint. (R. 24.) Villareal disagrees. (*See* R. 25.) Villareal only seeks summary judgment on her defamation claim; she says that every reasonable jury would find that when she returned to the store, Aldrich defamed her by accusing her of stealing. (R. 20.) The Buckle disagrees. (*See* R. 22.)

### II.

The parties (more so The Buckle than Villareal) have not paid enough attention to the summary-judgment burdens. So the Court will articulate them in some detail.

When a party seeks summary judgment on a claim or defense for which it *does not* bear the burden of proof at trial, it may discharge its initial summary-judgment burden by "pointing

out to the district court . . . that there is an absence of evidence to support [the non-moving party's] case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party discharges its initial burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the non-moving party's claims to a jury, or whether the evidence is so one-sided that the moving party prevails as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this determination, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Babcock & Wilcox Co. v. Cormetech, Inc.*, 848 F.3d 754, 758 (6th Cir. 2017).

When a party seeks summary judgment on a claim or defense for which it *does* bear the burden of proof at trial, the same burden-shifting framework applies—but with one significant change. In particular, the moving party's initial summary-judgment burden is greater: it "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) ("In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it" (internal quotation marks omitted)); Charles Alan Wright, et al., 10A Fed. Prac. & Proc. § 2727.1 (4th ed.).

**III.**

The Court begins with The Buckle's motion for summary judgment. And because it simplifies the analysis somewhat, the Court first takes up The Buckle's claim that no reasonable jury could find that its staff intentionally inflicted emotional distress upon Villareal. The Court then turns to The Buckle's arguments regarding Villareal's claims of false imprisonment and defamation.

**A.**

The Buckle makes two arguments for summary judgment on Villareal's claim of intentional infliction of emotional distress (IIED).

One lacks a legal basis. The Buckle asserts that Michigan Compiled Laws § 600.2917, a statute that limits a merchant's liability for claims arising from shoplifting, shields it from an IIED claim. (R. 24, PID 361.) But the statute says it applies to "civil action[s] . . . for false imprisonment, unlawful arrest, assault, battery, libel, or slander." Mich. Comp. Laws § 600.2917. IIED is nowhere in that list. And consistent with the canon of statutory construction that unlisted items are thought to be excluded (*expressio unius est exclusio alterius*), the Michigan Court of Appeals has squarely held that § 600.2917 does not apply to claims of IIED, *see Mosley v. Federals Dep't Stores, Inc.*, 271 N.W.2d 224, 227 (Mich. Ct. App. 1978). So the statute does not apply to Villareal's IIED claim.

The Buckle's other argument is that Villareal lacks sufficient evidence of two necessary elements of her IIED claim: that Buckle staff engaged in "extreme and outrageous conduct" and that she suffered "severe emotional distress." (R. 24, PID 365); *see also Dalley v. Dykema Gossett*, 788 N.W.2d 679, 694 (Mich. Ct. App. 2010) ("To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the

defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." (internal quotation marks omitted)). The Court agrees with The Buckle that no reasonable jury could find that Buckle staff engaged in "extreme and outrageous conduct."

> The Michigan Supreme Court has described extreme and outrageous conduct this way:
>
> "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908–09 (Mich. 1985) (quoting Restatement (Second) of Torts § 46 (1965)). The Court continued, "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 909 (internal quotation marks omitted).

Setting aside for a moment the question of intent, and focusing solely on conduct, no reasonable jury could think what retail staff did here was "utterly intolerable in a civilized community."

On the one hand, under Villareal's account, Buckle employees performed a harassing search. According to Villareal, the alarm sounded before she even reached the sensor gate. Despite this, Buckle staff and mall security swarmed her and her children. Then, without having Villareal walk through the sensor gate, and without obtaining permission to search, Buckle staff grabbed Villareal's purse and coat, told her to lift her shirt, searched the stroller, searched all of her children's coats, patted down her son as if he was a criminal suspect, and grabbed NNB's left

arm to pull her off the floor. (R. 24, PID 419, 424–25, 428.) And, says Villareal, Buckle staff made accusations during the search: "we know you have something, you have something on you." (R. 24, PID 431.) The whole scene happened in plain view of both people inside and outside the store. Then, despite not finding any clothing, and despite that the alarm did not sound when Villareal and her children left the store, when Villareal returned to the store, Aldrich accused her of having a tool to cut sensors and of stealing merchandise.

On the other hand, the search only lasted a few minutes. And, although it was done in plain view, someone being stopped at a store's exit for setting off the alarm is not a remarkable event. And while Villareal's son urinated on himself, Villareal has not identified evidence that Buckle staff were aware that Villareal's son could not wait a few minutes to go to the bathroom. Similarly, while Villareal told Buckle staff not to touch NNB, Villareal has not identified evidence that Aldrich (as opposed to other staff) knew NNB suffered from autism. *See Ledsinger v. Burmeister*, 318 N.W.2d 558, 562 (Mich. Ct. App. 1982) ("[T]he extreme and outrageous character of the conduct may arise from . . . [the actor's] knowledge of peculiar susceptibilities of the distressed party.").

On balance, while a reasonable jury could find that Buckle staff treated Villareal and her children without due respect and subjected them to embarrassment, that is far short of "extreme and outrageous" conduct. *See Todd v. NBC Universal (MSNBC)*, No. 323235, 2015 WL 8539703, at *5 (Mich. Ct. App. Dec. 10, 2015) ("While the conduct at issue may have been unpleasant and even disturbing, the threshold for proving extreme and outrageous conduct is great.").

What makes this something of a close call is the question of intent. If Buckle staff had no reason to believe Villareal was stealing, then the search and accusations are more outrageous. And if Buckle staff had an illicit reason, much more so.

From The Buckle's perspective, there were legitimate reasons to suspect Villareal of theft: staff had heard the sound of sensors being popped from Villareal's fitting room, they had found broken sensors where her children had been running, and Villareal had (twice) crossed the sensor gate setting off the store's alarm. Indeed, The Buckle stresses these points in its motion. (R. 24, PID 361.)

But the evidence must be viewed in the light most favorable to Villareal and all reasonable inferences must be drawn in her favor. Villareal's testimony strongly suggests that at no point did she or her children remove any sensors. And Villareal testified that the alarm sounded when she was "nowhere near the door" and that Buckle staff likely set off the alarm because they were targeting her. This claim has some limited support: Evanish said that as a matter of Buckle policy, staff would not stop anyone suspected of shoplifting unless the alarm sounded. (R. 24, PID 446.) So if Buckle staff were set on stopping Villareal and wanted to comply with company policy, they might have been motivated to set off the alarm. Further, Villareal speculated that Buckle staff may have profiled her: "I've got five small children, I'm young, I was by myself, you know, I'm white, [my children are] Mexican, you know. . . . And white employees were at the store." (R. 24, PID 430.)

Given this testimony, additional review of the record is necessary to address the issue of intent. Fully crediting Villareal's account arguably rules out broken sensors prompting the search. And, although a stretch, maybe a reasonable jury could find that Buckle staff set off the alarm so that they could search Villareal without violating company policy. But ruling out the

sensors and the alarm does not eliminate all the legitimate reasons the Buckle staff suspected Villareal of theft. In particular, Villareal offers nothing to rebut Evanish's testimony that Buckle staff called mall security in part because "[t]hey had already tried using recovery statements, and then the individual in the fitting room was acting even more suspicious, and the children were running around, putting the clothes back and grabbing more clothes and then continuing the cycle." (R. 24, PID 449.) Nor has Villareal offered anything to rebut Eickholt's testimony that, when she arrived at the store, a Buckle employee told her "that the kids were handing [a female in the fitting room] merchandise underneath the door." (R. 24, PID 469.) Eickholt testified that this was "not Buckle's policy." According to her, "Buckle employees take care of giving the customer the merchandise, taking the merchandise they don't want. That way, they can keep track of what is in and out of the fitting rooms." (R. 24, PID 469.) Against this evidence of non-discriminatory intent, Villareal has merely hypothesized that Buckle staff both recognized that she was Caucasian and her children were Mexican and were motivated to stop and search her for that discriminatory reason. This is not sufficient to create a genuine issue of material fact. *See Babcock & Wilcox Co. v. Cormetech, Inc.*, 848 F.3d 754, 758 (6th Cir. 2017) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment." (internal citation omitted)).

In sum, under Villareal's account, a reasonable jury could find that Buckle staff did not pay due regard to Villareal's rights and sensibilities when they searched her and accused her of theft (more on this below), but a reasonable jury could not find that their conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community,"

*Roberts*, 374 N.W.2d at 908–09 (internal quotation marks omitted); *see also Clarke v. K Mart Corp.*, 495 N.W.2d 820, 821, 823 (Mich. Ct. App. 1992) (finding IIED claim failed a matter of law where merchant "snatched" a bag suspected of containing stolen merchandise from plaintiff's hand and detained plaintiff for ten to fifteen minutes to match items with receipt; reasoning that "although unquestionably offensive, the conduct charged [was] not so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (internal quotation marks omitted)). The Buckle is thus entitled to summary judgment on Villareal's claim of intentional infliction of emotional distress.

## B.

The Buckle makes two arguments for why Villareal's claim of false imprisonment should not be presented to a jury.

The first warrants little discussion. After reciting the elements of a false-imprisonment claim, the Buckle says, "[i]t should be undisputed that there was no detention in this matter." (R. 24, PID 363–64.) This is entirely conclusory and does not discharge The Buckle's initial summary-judgment burden of pointing out that Villareal lacks evidence of confinement. *See Celotex*, 477 U.S. at 325. This is especially so given that Villareal testified that mall security and Buckle staff "swarm[ed]" her and her children and "blocked" the store's exit. (R. 24, PID 428, 433.)

So the Court turns to The Buckle's primary argument: it says Michigan Compiled Laws § 600.2917, the merchant's defense referenced earlier, entitles it to summary judgment on Villareal's claim of false imprisonment.

Section 600.2917 limits a merchant's damage exposure when it is sued for certain torts arising out of its attempt to prevent shoplifting. Although the statute is complicated, it can be restated (somewhat) more simply. Under § 600.2917, if a plaintiff brings a claim of "false imprisonment, unlawful arrest, assault, battery, libel, or slander" that arises out of suspected theft of merchandise from a store, and "if the merchant . . . had probable cause for believing and did believe that the plaintiff had committed or aided or abetted in the larceny," then the plaintiff cannot recover "damages for or resulting from mental anguish or punitive, exemplary, or aggravated damages"—"unless" the plaintiff proves at least one of four exceptions. *See* Mich. Comp. Laws § 600.2917; *Bonkowski v. Arlan's Dep't Store*, 174 N.W.2d 765, 769 (Mich. 1970) (providing that it is the plaintiff's burden to establish one of the "unless" conditions). The four exceptions: the merchant "used unreasonable force, detained the plaintiff an unreasonable length of time, acted with unreasonable disregard of the plaintiff's rights or sensibilities, or acted with intent to injure the plaintiff." Mich. Comp. Laws § 600.2917.

As an initial matter, The Buckle is incorrect that, if applicable, § 600.2917 provides it with a complete defense to Villareal's claims of false imprisonment (and defamation). The Buckle's position is grounded in Villareal's discovery responses where she admits that she suffered no "bodily harm" and instead claims "emotional distress." (*See* R. 24, PID 360–61, 391, 393.) The problem for The Buckle is that nowhere in these responses does Villareal affirmatively say that she is not seeking nominal damages. (*See* R. 24, PID 388–94.) And in her summary-judgment briefs, she affirmatively says she is. (R. 20, PID 132; R. 25, PID 509.) This is significant because, consistent with the statute's text (it only refers to "damages for or resulting from mental anguish or punitive, exemplary, or aggravated damages"), the case law says that § 600.2917 does not preclude nominal damages. *Tumbarella v. Kroger Co.*, 271 N.W.2d 284,

288 (Mich. Ct. App. 1978). So even if every reasonable jury would find that § 600.2917 shields The Buckle, this case would still proceed to trial on Villareal's false imprisonment and defamation claims.

Essentially then, The Buckle asks this Court to find, as a matter of law, that Villareal is not entitled to mental-anguish or enhanced damages for her false-imprisonment claim.

The Court declines to do so. Even if every reasonable jury would find that The Buckle had probable cause to believe Villareal was attempting to steal merchandise, The Buckle has not shown that Villareal lacks evidence that its staff "acted with unreasonable disregard of [her] rights or sensibilities," Mich. Comp. Laws § 600.2917. The Buckle attempts to discharge its initial summary-judgment burden by arguing that its staff had reason to believe Villareal might be stealing because "the door alarm sounded when she exited the store, and sounded again when she crossed the threshold a second time according to [Villareal's] own testimony." (R. 24, PID 362.) This is not an accurate recitation. Villareal testified that the alarm sounded when she was "nowhere near the door" (R. 24, PID 420), that she was searched before walking through the sensor gate (*id.*), and that, after being searched, she and her children walked through the sensor gate and did not set off the alarm (R. 24, PID 431). The Buckle also says that its staff "proceeded, by all accounts, to *ask* to search her bags." (R. 24, PID 362.) Again incorrect. Villareal testified: "Q. Did they ask your permission . . . to search? A. No. No. Q. No one asked you whether it was okay to look in the stroller? A. No. Q. Nobody asked you if it was okay to look in your purse? A. No." (R. 24, PID 424–25.) Thus, The Buckle has not discharged its initial summary-judgment burden of showing that Villareal lacks evidence upon which a jury could find that Buckle staff "acted with unreasonable disregard of [her] rights or sensibilities."

And even if The Buckle had discharged its initial burden, the Court would find that Villareal has "come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita*, 475 U.S. at 587. It is true that instead of explicitly addressing § 600.2917's rights-or-sensibilities exception, Villareal argues that the search satisfied the statute's lengthy-detention exception. (R. 25, PID 508.) This is unavailing: the video shows the whole search lasted three or four minutes. But Villareal's failure to directly address the rights-or-sensibilities exception can be excused: she indirectly addressed that exception by arguing that the search amounted to extreme and outrageous conduct. (*See* R. 24, PID 512.) And largely for the reasons already provided in addressing Villareal's claim of extreme and outrageous conduct, the Court believes that a reasonable jury could find that Buckle staff "acted with unreasonable disregard of [Villareal's] rights or sensibilities." In particular, when the facts are viewed in the light most favorable to Villareal, Buckle staff lacked a strong basis for suspecting Villareal, the search involved physical contact with Villareal's belongings and her children, it was accompanied by accusations of theft, and it was done in plain view of customers and possibly those in the mall. While not extreme and outrageous conduct, a reasonable jury could find that Buckle staff acted with unreasonable disregard of Villareal's rights or sensibilities.

Thus, The Buckle is not entitled to summary judgment on Villareal's claim of false imprisonment.

## C.

The Buckle says that Villareal's defamation claim should not be presented to the jury for three reasons. One is that Villareal lacks evidence showing that "a defamatory statement per se actually occurred." (R. 24, PID 366.) The Buckle also argues that Villareal is required to, but cannot, show that Buckle staff acted with "actual malice" when it made the alleged defamatory

statements. (R. 24, PID 366–67.) The Buckle further argues that Michigan Compiled Laws § 600.2917 shields it from Villareal's defamation claim. (R. 24, PID 361–62.) The Court addresses these arguments in this order.

The Buckle attempts to show that its staff never said anything defamatory about Villareal via Evanish's and Eickholt's testimony. (R. 24, PID 366; *see also* R. 22, PID 199); *see also Sarkar v. Doe*, 897 N.W.2d 207, 220 (Mich. Ct. App. 2016) ("A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."). In particular, The Buckle relies on this testimony from Evanish:

> Q Did anybody ever tell her out loud that, 'You stole merchandise. Don't come back here again'?
>
> A When [Villareal] came in to get the phone number for Corporate . . . I recall Kristen [Aldrich] saying that she wasn't allowed back in the store, 'We don't allow thieves in our store,' something of that nature. . . .
>
> Q . . . Are you sure that's what Kristen said?
>
> A I'm not positive, no.
>
> Q Okay. You don't know if she said, 'We don't allow thieves in the store'?
>
> A No. I'm not positive what she said. I know something was referred to is that she wasn't welcome back in the store.
>
> Q Okay. So, it's possible Kristen just told her, 'You're not welcome back'?
>
> A Yes.
>
> Q But didn't say anything about thieves?
>
> A No.

(R. 24, PID 451.) And The Buckle relies on this testimony from Eickholt:

> Q At any point did you hear any of The Buckle employees suggest that [Villareal] had a tool to cut sensors?
>
> A No.
>
> Q Do you recall at any point anyone asking her, 'Where are you hiding them?'
>
> A No.
>
> Q Or making statements, 'We know you have something'?

A No.

(R. 24, PID 480.) The Buckle says that the above testimony shows that no reasonable jury could find that its staff made a defamatory statement. (*See* R. 24, PID 366.)

The Court disagrees. Aside from the fact that Evanish's testimony is equivocal and that Eickholt additionally testified that she could not remember what was said when Villareal returned to the store (*see* R. 24, PID 471), The Buckle has again ignored Villareal's testimony. Villareal testified that when she returned to the store, Aldrich accused her of having a tool to cut sensors. (R. 24, PID 434.) She also testified, "I said [to Aldrich] I didn't take anything, you guys have proven that I didn't take anything and they said well, we know you did. You disposed of it prior to coming back." (R. 24, PID 432.) And while Villareal may have been referring to the initial search and not her return to the store, she further testified, "the employees said and made accusations of me stealing, of me being a thief loud enough to where all their patrons in the store could hear." (R. 24, PID 434.) According to Villareal, Buckle staff also stated, "We know you stole something. . . . You're good at hiding." (R. 24, PID 434.) Villareal's testimony creates a genuine issue of material fact as to whether Buckle staff made a defamatory remark.

The Court thus turns to The Buckle's argument that under Michigan Compiled Laws § 600.2917, Villareal must demonstrate that Buckle staff made defamatory statements with actual malice. The Buckle says—twice in its motion and six times in its opposition to Villareal's motion—that *Tumbarella v. Kroger Co.*, 271 N.W.2d 284 (Mich. Ct. App. 1978), establishes this proposition of law. It does not. True, the *Tumbarella* court discussed both actual malice and § 600.2917. But the court discussed those two legal concepts in completely different parts of its opinion. *Compare* 271 N.W.2d at 288 (discussing § 600.2917 in the context of a false imprisonment claim), *with* 271 N.W.2d at 289–90 (discussing actual malice in the context of

22

overcoming an employer's qualified privilege to make a defamatory statement). Moreover, § 600.2917 makes no mention of "actual malice." It does not say that if the merchant had probable cause, the plaintiff must show that the merchant's defamatory statement was made with actual malice. It instead says that (for certain of the exceptions to apply) if the merchant had probable cause, the plaintiff must show that the merchant's defamatory statement was made with disregard to her rights or sensibilities or with the intent to injure. Thus, The Buckle has not persuaded the Court that § 600.2917 requires Villareal to show that Buckle staff made defamatory statements with actual malice.

This leaves The Buckle's third argument: that § 600.2917 warrants summary judgment in its favor on Villareal's defamation claim because Buckle staff had probable cause to believe Villareal had taken merchandise, and Villareal lacks evidence satisfying any of the statute's four exceptions. For purposes of this argument, The Buckle has lumped Villareal's defamation claim together with her false-imprisonment claim. (*See* R. 24, PID 361–62.) In other words, as with Villareal's false-imprisonment claim, The Buckle asserts that its staff did not unreasonably disregard Villareal's rights or sensibilities because the alarm sounded when Villareal passed through the sensor gate and again when she came back through. (R. 24, PID 362.)

In the context of addressing Villareal's false-imprisonment claim, the Court found that this assertion does not discharge The Buckle's initial summary-judgment burden because it relies on a version of the facts that is contrary to Villareal's.

But there is another reason The Buckle has not discharged its initial summary-judgment burden on the rights-or-sensibilities exception. Part (if not all) of Villareal's claim of defamation is based on statements that Aldrich made after Villareal returned to the store. As will be explained below, there may have been reasons that Aldrich believed Villareal had stolen

merchandise even at that time. But The Buckle makes no effort to explain why those reasons trump these undisputed facts: by the time Villareal returned to the store, she had been searched, no merchandise had been discovered, and Villareal and her children had left the store without setting off the alarm. In other words, The Buckle has not attempted to show that Aldrich maintained a reasonable basis for accusing Villareal of theft at the time Villareal returned to the store. And if Aldrich lacked a reasonable basis for the accusations she made, a reasonable jury could find that she "acted with unreasonable disregard of [Villareal's] rights or sensibilities," Mich. Comp. Laws § 600.2917.

In sum, none of The Buckle's three arguments show that it is entitled to summary judgment on Villareal's defamation claim.

## D.

The Buckle also seeks "Summary Judgment under Fed. R. Civ. P. 12(b)(6)." (R. 24, PID 360.) The Buckle says that because Villareal "alleged in her Complaint that the door alarm sounded when she exited the store," she pled that Buckle staff had probable cause to believe she was stealing, and therefore, Michigan Compiled Laws § 600.2917 applies. (R. 24, PID 359.) And, according to the Buckle, Villareal's complaint does not set forth facts making any of the four exceptions to § 600.2917 plausible. (*Id.*) It follows, says The Buckle, that Villareal's claims must be dismissed. (R. 24, PID 359–60.)

There is no merit to The Buckle's request for relief under Rule 12(b)(6). First, that is not a "summary judgment" rule. Moreover, a defendant may raise an affirmative defense (such as § 600.2917) to obtain dismissal under Rule 12(b)(6)—"provided that the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief." *Estate of Barney v. PNC Bank, Nat. Ass'n*, 714 F.3d 920, 926 (6th Cir. 2013). Villareal's own allegations do not

show that the Buckle had probable cause to believe that she stole merchandise. Just the opposite. Villareal pleads that The Buckle "lacked probable cause to detain and search" her, that she "was not observed hiding any merchandise," and, most significantly, that she "did not walk through the door when the door alarm went off; in fact, Plaintiff was approximately ten (10) feet away from the door sensors." (R. 17, PID 96.) The Buckle's request for relief under Rule 12(b)(6) ignores these allegations.

* * *

In sum, The Buckle is entitled to summary judgment on Villareal's claim of intentional infliction of emotional distress. The Buckle is not entitled to summary judgment (partial or complete) on Villareal's claims of false imprisonment and defamation.

## IV.

The Court turns to Villareal's motion for summary judgment. Her motion is based only on the remarks Aldrich allegedly made when Villareal returned to the store. (*See* R. 20, PID 130.) In particular, Villareal says that every reasonable jury would find that, when she came back to the Buckle, Aldrich defamed her by accusing her of having a tool to cut sensors and of stealing merchandise. (*See id.*)

As noted above, because Villareal has the burden of proof at trial on her defamation claim, she "must lay out the elements of the claim, cite the facts which [she] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012).

Villareal has succeeded on the first two steps. She lays out the elements of a defamation claim (R. 24, PID 130), which are "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication [(defamation per quod)]," *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005). And Villareal has set forth facts she says satisfies these four elements. (*See* R. 24, PID 130–34.)

Where Villareal's motion falls short is demonstrating that the record is so one-sided that every reasonable jury would find Aldrich defamed her. In particular, and without opining on whether Villareal can establish other elements of her defamation claim, she has not shown that every reasonable jury would find that Aldrich acted with "fault amounting at least to negligence" when Aldrich accused her of having a tool to cut sensors and stealing.

Before explaining this conclusion, the Court makes two points. First, although Villareal is correct that The Buckle has not directly contested the negligence element (*see* R. 23, PID 328), this does not preclude the Court from examining the evidence that bears on Aldrich's negligence. Villareal has a high initial summary-judgment burden, *see Hotel 71*, 778 F.3d at 601; *Surles*, 678 F.3d at 455–56, and The Buckle has no obligation to say anything until Villareal discharges it, *Hotel 71*, 778 F.3d at 601. So the Court must review the record at some depth to decide whether Villareal has discharged her initial burden. Moreover, The Buckle, in making other arguments, has cited many of the facts that bear on the negligence element. (*See* R. 22, PID 198.)

The second point relates to the evidence—or lack thereof. Whether Aldrich was negligent when she allegedly made the defamatory statements to Villareal turns on what a reasonable person—in Aldrich's shoes—would think was true. Yet no one deposed Aldrich. And no one

provided an affidavit from her. So the Court is left to determine whether every reasonable jury would find Aldrich negligent when she accused Villareal of theft without even hearing from the person who made the accusation.

As for the evidence that is before the Court, it is mixed. On the one hand, as Villareal points out (R. 20, PID 133), by the time she returned to the store, Buckle staff had searched her and her children and had found no merchandise. Further, Villareal and her children had left the store without triggering the alarm. Those facts indicate that Aldrich did not exercise reasonable care in accusing Villareal of theft. On the other hand, taking the facts in the light most favorable to The Buckle, Buckle staff did not perform an exhaustive search of Villareal and her children. (*See* R. 24, PID 450, 470.) And it appears that Aldrich was present when Villareal was searched, so a jury could reasonably find that she knew the search was not exhaustive. Additionally, if The Buckle's account is true, its staff "heard sensors being popped off inside of the fitting room" when Villareal was inside and found "defeated, broken sensors where [Villareal's children] had been running around." (R. 24, PID 449.) And, Aldrich apparently had some knowledge of this by the time Villareal returned to the store: she allegedly told Villareal they had found broken sensors in the fitting room and accused her of having a tool to cut them. (R. 24, PID 434.)

So Aldrich's mind was apparently full of conflicting facts when she allegedly made the defamatory remarks. Some facts indicated that Villareal stole: Buckle staff did not perform an exhaustive search, they heard sensors being removed, and sensor removal would explain why the alarm did not sound when Villareal finally left the store. Other facts indicated the opposite: if Villareal set the alarm off when she first tried to leave, and no merchandise was found, then she should have set it off again when she finally left the store if, in fact, she had stolen something; but the alarm did not sound again. In the heat of the moment, even a reasonably careful person

may not have been able to reconcile the conflicting evidence of theft. And "fault amounting at least to negligence" is the failure to exercise reasonable—not extraordinary—care in making defamatory statements. *See Howe v. Detroit Free Press, Inc.*, 555 N.W.2d 738, 741 (Mich. Ct. App. 1996) ("The standard of conduct to which an actor must conform to avoid being negligent is that of a reasonable man under like circumstances."); Mich. Model Civ. Jury Instr. 118.08. Thus, while close, the Court finds that a reasonable jury could find that even when Villareal returned to the store to get the corporate number, a reasonable person in Aldrich's position could still have in good faith believed that Aldrich had cut sensors and stolen merchandise. And if a jury reaches that conclusion, it could not reasonably find Aldrich negligent for saying that Villareal cut sensors and stole merchandise.

Villareal is thus not entitled to summary judgment.

## V.

For the foregoing reasons, the Court DENIES Villareal's Motion for Partial Summary Judgment (R. 20) and GRANTS IN PART and DENIES IN PART The Buckle, Inc.'s Motion for Summary Judgment of All Claims (R. 24). In particular, The Buckle is entitled to summary judgment in its favor on Villareal's claim of intentional infliction of emotional distress. Villareal's claims of false imprisonment and defamation will proceed to trial.

SO ORDERED.

s/Laurie J. Michelson<br>
LAURIE J. MICHELSON<br>
U.S. DISTRICT JUDGE

Dated: September 28, 2017

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 28, 2017.

s/Keisha Jackson
Case Manager